**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**JULY 28, 2005**

SHIRLEY RORY and ETHEL WOODS,

> Plaintiffs-Appellees,

v                                                    No. 126747

CONTINENTAL INSURANCE COMPANY,
a/k/a CNA INSURANCE COMPANY

> Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

In this case, the trial court refused to enforce the one-year contractual limitations period contained in the insurance policy issued to plaintiffs. The trial court did so because it concluded that the one-year limitations provision was "unfair," unreasonable, and an unenforceable adhesion clause. The Court of Appeals affirmed, and defendant Continental Insurance Company (Continental) appeals.

This case raises two fundamental questions of contract law: (1) are insurance contracts subject to a standard of

enforcement different from that applicable to other contracts, and (2) under what conditions may a court disregard and refuse to enforce unambiguous contract terms?

We hold, first, that insurance policies *are* subject to the same contract construction principles that apply to any other species of contract. Second, unless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written. We reiterate that the judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of "reasonableness" as a basis upon which courts may refuse to enforce unambiguous contractual provisions.

Finally, in addition to these traditional contract principles, in this case involving an insurance contract, the Legislature has enacted a statute that permits insurance contract provisions to be evaluated and rejected on the basis of "reasonableness." The Legislature has explicitly assigned this task to the Commissioner of the Office of Financial and Insurance Services (Commissioner) rather than the judiciary. The Commissioner has allowed the

2

Continental insurance policy form to be issued and used in Michigan. No party here has challenged the Commissioner's action to allow the Continental policy to be issued or used in this state.

Accordingly, we reverse the Court of Appeals decision and remand the case to the circuit court for entry of an order of summary disposition in favor of defendant.

## I. Facts and Procedural History

Plaintiffs maintained an automobile insurance policy with defendant, which included optional coverage for uninsured motorist benefits. On May 15, 1998, plaintiffs were injured in an automobile accident. The police report filed at the time of the collision did not indicate whether either party was insured. More than a year later, in September 1999, plaintiffs filed a first-party no-fault suit against defendant and a third-party suit for noneconomic damages against Charlene Haynes, the driver of the other vehicle. Only after the suit was commenced was it discovered that Haynes was uninsured. On March 14, 2000, plaintiffs submitted a claim for uninsured motorist benefits to Continental. Defendant denied the claim because it was not filed within one year after the accident, as required by the insurance policy.

In August 2000, plaintiffs filed the present action, contesting Continental's denial of uninsured motorist benefits. Defendant filed a motion for summary disposition, relying on a limitations provision in the insurance contract that required that a claim or suit for uninsured motorist coverage "must be brought within 1 year from the date of the accident."

The trial court denied defendant's motion, holding that the one-year limitations period contained in the contract was unreasonable. After the Court of Appeals issued an opinion in an unrelated case,[1] defendant renewed its motion for summary disposition.

The trial court again denied defendant's motion for summary disposition, holding that the one-year limitation was an unenforceable adhesion clause. Because the limitation was not highlighted in the contract, was not bargained for by the purchaser, and constituted a "significant reduction" in the time plaintiffs would otherwise have to file suit against defendant, the trial

---

[1] *Williams v Continental Ins Co,* unpublished opinion per curiam of the Court of Appeals, issued April 23, 2002 (Docket No. 229183). In *Williams,* the panel considered identical policy language and concluded that the one-year limitation was "not so unreasonable as to be unenforceable" because the policy required that a claim be filed within a year, rather than a lawsuit.

court held that it would be "totally and patently unfair" to enforce the limitation contained in the policy.

On appeal, the Court of Appeals affirmed the trial court's decision to deny defendant's motion for summary disposition.[2] The Court of Appeals agreed with the trial court that a one-year period of limitations was unreasonable. The panel instead imposed a three-year period of limitations, holding:

> An insured may not have sufficient time to ascertain whether an impairment will affect his ability to lead a normal life within one year of an accident. Indeed, three of the factors to be considered in determining whether a serious impairment exists are the duration of the disability, the extent of residual impairment, and the prognosis for eventual recovery. Further, unless the police report indicates otherwise, the insured will not know that the other driver is uninsured until suit is filed, and the other driver fails to tender the defense to an insurance company. The insured, thus, must file suit well before the one-year period in order to assure that the information is known in time to make a claim or file suit against the insurance company within one year of the accident. Applying the standard set forth in *Camelot*, . . . we conclude that the limitation here is not reasonable because, in most instances, the insured (1) does not have "sufficient opportunity to investigate and file an action," where the insured may not have sufficient information about his own physical condition to warrant filing a claim, and will likely not know if the other driver is insured until legal process is commenced, (2) under these circumstances, the time will often be "so short as to work a

---

[2] 262 Mich App 679; 687 NW2d 304 (2004).

practical abrogation of the right of action," and (3) the action may be barred before the loss can be ascertained.

* * *

Here, the Legislature has provided a three-year limitations period for personal injury claims. The insured must sue the other driver within three years of the injury, whether or not the insured has sufficient information to know if a serious impairment has been sustained, and whether or not the other driver is insured. Application of the three-year period would not deprive the insured of a sufficient opportunity to investigate and file a claim and does not work a practical abrogation of the right. [*Id.* at 686-687 (internal citations omitted).][3]

Subsequently, we granted defendant's application for leave to appeal.[4]

## II. Standard of Review

This Court reviews de novo the trial court's decision to grant or deny summary disposition.[5] In reviewing the motion, the pleadings, affidavits, depositions, admissions, and any other admissible evidence are viewed in the light

---

[3] Relying on *Herweyer v Clark Hwy Services, Inc,* 455 Mich 14; 564 NW2d 857 (1997), the Court of Appeals agreed with the trial court that the insurance policy was adhesive and "should receive close judicial scrutiny." 262 Mich App at 687.

[4] 471 Mich 904 (2004).

[5] *Van v Zahorik*, 460 Mich 320; 597 NW2d 15 (1999).

most favorable to the nonmoving party.[6] Moreover, questions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo.[7] In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument.[8]

### III. Analysis

#### A. THE "REASONABLENESS DOCTRINE" IN MICHIGAN

Under the language of the insurance policy at issue, an insured is required to file a claim or lawsuit for uninsured motorist benefits "within 1 year from the date of the accident." Plaintiff asks this Court to refuse to enforce that provision of the insurance contract because the limitations period is not "reasonable." This action, being a claim arising under the insurance policy, is a first-party claim against the insurer. Therefore, contrary to the Court of Appeals conclusion that a three-year period

---

[6] *Radtke v Everett*, 442 Mich 368, 374; 501 NW2d 155 (1993).

[7] *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002); *Bandit Industries, Inc v Hobbs Int'l, Inc (After Remand)*, 463 Mich 504, 511; 620 NW2d 531 (2001).

[8] *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 47; 664 NW2d 776 (2003).

of limitations applies to this lawsuit, plaintiff's suit against Continental—in the absence of the limitations provision contained in the policy—would be governed by the general six-year period of limitations applicable to contract actions.[9]

Uninsured motorist insurance permits an injured motorist to obtain coverage from his own insurance company to the extent that a third-party claim would be permitted against the uninsured at-fault driver.[10] Uninsured motorist coverage is optional—it is not compulsory coverage mandated by the no-fault act.[11] Accordingly, the rights and limitations of such coverage are purely contractual and are construed without reference to the no-fault act.[12]

---

[9] MCL 600.5807(8). If plaintiffs brought suit against the at-fault driver instead of their own insurance carrier, such a third-party claim would be limited to being brought within three years pursuant to former MCL 600.5805(9), now MCL 600.5805(10), which governs claims for injury to person or property.

[10] The owner or operator of a vehicle is subject to tort liability for noneconomic loss only if the injured motorist has suffered death, serious impairment of a body function, or permanent serious disfigurement. MCL 500.3135(1); *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004); *Auto Club Ins Ass'n v Hill*, 431 Mich 449; 430 NW2d 636 (1988).

[11] *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 533; 676 NW2d 616 (2004).

[12] *Id.*

In support of their claim that a contractual limitations provision may be disregarded on the basis of an assessment of "reasonableness," plaintiffs rely on *Tom Thomas Org, Inc v Reliance Ins Co.*[13] In *Tom Thomas,* the plaintiff filed suit fifteen months after the loss to recover for property damage under an insurance policy. The policy contained a one-year limitation on filing suit.

Even a cursory reading of *Tom Thomas* reveals that the holding of the case was premised on "judicial tolling" rather than reasonableness. In fact, the majority in *Tom Thomas* specifically declined to address the reasonableness of the one-year limitation; instead, it predicated its holding on "reconciliation of the provisions of the policy" by the imposition of judicial tolling.[14] In dicta, the Court noted the "general rule" that a shortened contractual period of limitations was "valid *if reasonable* even though the period is less than that prescribed by otherwise applicable statutes of limitation."[15]

---

[13]    396 Mich 588; 242 NW2d 396 (1976).

[14]    The *Tom Thomas* Court held that the contractual period of limitations was judicially tolled "from the time the insured gives notice until the insurer formally denied liability." *Id.* at 597.

[15]    *Id.* at 592 (emphasis added). In support of the "general rule," the *Tom Thomas* Court cited a secondary
(continued…)

9

In *Camelot Excavating Co, Inc v St Paul Fire & Marine Ins Co*,[16] this Court expanded upon the "reasonableness" dicta articulated in *Tom Thomas*. In *Camelot*, the plaintiff sought payment on a labor and material bond from the defendant. The defendant moved for summary disposition on the basis of the one-year limitations period contained in the bond contract. Citing *Tom Thomas* for the proposition

---

(…continued)
source rather than Michigan authority. However, the opinion subsequently noted that prior Michigan case law had enforced shortened contractual limitations periods without resort to a "reasonableness" analysis. *Id*. at 592 n 4.

In fact, prior case law had consistently upheld the validity of contractually shortened limitations periods; such provisions could be avoided only where the insured could establish waiver on the part of the insurer or estoppel. See *McIntyre v Michigan State Ins Co*, 52 Mich 188; 17 NW 781 (1883); *Law v New England Mut Accident Ass'n*, 94 Mich 266; 53 NW 1104 (1892); *Turner v Fidelity & Cas Co*, 112 Mich 425; 70 NW 898 (1897) (insurance company waived one-year limitation by conduct); *Harris v Phoenix Accident & Sick Benefit Ass'n*, 149 Mich 285; 112 NW 935 (1907)(failure of the insured to sue within six months was not waived); *Friedberg v Ins Co of North America*, 257 Mich 291; 241 NW 183 (1932)(where settlement negotiations are broken off by the insurer near the end of the contractual limitations period, the provision was deemed waived); *Hall v Metro Life Ins Co*, 274 Mich 196; 264 NW 340 (1936); *Barza v Metro Life Ins Co,* 281 Mich 532; 275 NW 238 (1937)(the plaintiff was bound by two-year limitations clause where there was no evidence of waiver or estoppel); *Bashans v Metro Mut Ins Co,* 369 Mich 141; 119 NW2d 622 (1963) (insurer did not waive two-year "binding" limitations clause); *Better Valu Homes, Inc v Preferred Mut Ins Co*, 60 Mich App 315; 230 NW2d 412 (1975).

[16]    410 Mich 118; 301 NW2d 275 (1981).

that a shortened period of limitations is acceptable "where the limitation is reasonable,"[17] *Camelot* relied on case law from foreign jurisdictions in articulating a three-part test for evaluating the reasonableness of a contractually shortened limitations period.[18] Ultimately, the Court held that the one-year period of limitations was reasonable, and that no public policy considerations precluded enforcement of the contractual provision.

In the end, *Camelot* enforced the contractually shortened limitations period at issue. However, rather than simply enforcing the contract as written, the decision in *Camelot* was premised upon the adoption of a "reasonableness" test found in the dicta of *Tom Thomas*. In

---

[17]     *Camelot* also cited *Barza v Metro Life* and *Turner v Fidelity*, n 15 *supra*, in support of the "rule" that a contractual limitations provision may be upheld if reasonable. *Camelot, supra* at 126. However, neither *Barza* nor *Turner* may be properly read as requiring reasonableness before a contractual provision may be deemed valid. In both cases, the analysis focused on whether the insurer waived the otherwise binding limitations provision.

[18]     *Camelot* held that a contractually shortened limitations period is reasonable if (1) the claimant has sufficient opportunity to investigate and file an action, (2) the time is not so short as to work a practical abrogation of the right of action, and (3) the action is not barred before the loss or damage can be ascertained. *Id*. at 127.

failing to employ the plain language of the contract, the *Camelot* Court erred.

A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*.[19] Courts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract. This Court has previously noted that "'[t]he general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.'"[20]

When a court abrogates unambiguous contractual provisions based on its own independent assessment of

---

[19] *Harrington v Inter-State Business Men's Accident Ass'n,* 210 Mich 327; 178 NW 19 (1920); *Indemnity Ins Co of North America v Geist*, 270 Mich 510; 259 NW 143 (1935); *Cottrill v Michigan Hosp Service*, 359 Mich 472; 102 NW2d 179 (1960); *Henderson v State Farm Fire & Cas Co*, 460 Mich 348; 596 NW2d 190 (1999); *Cruz v State Farm Mut Automobile Ins Co*, 466 Mich 588; 648 NW2d 591 (2002).

[20] *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002), quoting *Twin City Pipe Line Co v Harding Glass Co*, 283 US 353, 356; 51 S Ct 476; 75 L Ed 1112 (1931).

"reasonableness," the court undermines the parties' freedom of contract.[21] As this Court previously observed:

> This approach, where judges . . . rewrite the contract . . . is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance such as a contract in violation of law or public policy. This Court has recently discussed, and reinforced, its fidelity to this understanding of contract law in *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002). The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art I, § 10, cl 1. Our own state constitutions over the years of statehood have similarly echoed this limitation on government power. It is, in short, an unmistakable and ineradicable part of the legal fabric of our society. Few have expressed the force of this venerable axiom better than the late Professor Arthur Corbin, of Yale Law School,

---

[21] Justice Kelly maintains that reviewing contract provisions for "reasonableness" is "essential in order to accurately implement the intent of the contracting parties." *Post* at 6. However, it is difficult to rationalize implementing the intent of the parties by imposing contractual provisions that are *completely antithetic* to the provisions contained in the contract. Rather, the intent of the contracting parties is best discerned by the language actually used in the contract. As this Court noted in *Quality Products & Concepts Co v Nagel Precision, Inc,* 469 Mich 362, 375; 666 NW2d 251 (2003), "an unambiguous contractual provision is reflective of the parties' intent as a matter of law."

who wrote on this topic in his definitive study of contract law, Corbin on Contracts, as follows:

> "One does not have 'liberty of contract' unless organized society both forbears and enforces, forbears to penalize him for making his bargain and enforces it for him after it is made. [15 Corbin, Contracts (Interim ed), ch 79, § 1376, p 17.]"[22]

Accordingly, we hold that an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy. A mere judicial assessment of "reasonableness" is an invalid basis upon which to refuse to enforce contractual provisions. Only recognized traditional contract defenses may be used to avoid the enforcement of the contract provision.[23] To the degree that *Tom Thomas, Camelot,* and their progeny abrogate unambiguous contractual terms on the basis of reasonableness determinations, they are overruled.[24]

---

[22] *Wilkie, supra* at 51-52.

[23] Examples of traditional defenses include duress, waiver, estoppel, fraud, or unconscionability. See *Quality Products & Concepts Co, supra* (waiver); *Beloskursky v Jozwiak*, 221 Mich 316; 191 NW 16 (1922) (estoppel); *Hackley v Headley*, 45 Mich 569; 8 NW 511 (1881) (duress); *Witham v Walsh*, 156 Mich 582; 121 NW 309 (1909) (fraud); *Gillam v Michigan Mortgage-Investment Corp*, 224 Mich 405; 194 NW 981 (1923) (unconscionability).

[24] Justice Kelly maintains that the *Camelot* Court "applied a very old and well tested legal rule" when it

(continued…)

## B. The Provision is not contrary to law or public policy

We next consider whether the contractually shortened period of limitations violates law or public policy. As noted by this Court, the determination of Michigan's public policy "is not merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law."[25] In ascertaining the parameters of our public policy, we must look to "policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law."[26]

As an initial matter, we note that this Court has previously held that Michigan has "no general policy or statutory enactment . . . which would prohibit private

---

(…continued)

adopted the so-called "reasonableness doctrine." *Post* at 7. However, as even the *Tom Thomas Court* recognized, Michigan jurisprudence enforced contractually shortened limitations provisions without regard to the "reasonableness" of the provisions. See n 15 of this opinion. Citation of case law from other jurisdictions simply does not alter the fact that the "very old and well tested legal rule" of *Michigan* eschewed using "reasonableness" as a basis for abrogating contractually shortened limitations provisions.

[25]    *Terrien, supra* at 67.

[26]    *Id.* at 66-67.

15

parties from contracting for shorter limitations periods than those specified by general statutes."[27] This is consistent with our case law, which had held that contractually shortened periods of limitations were valid, and were to be disregarded only where the insured could establish estoppel or prove that the insurer waived the contractual provision.[28]

---

[27] *Camelot*, *supra* at 139.

[28] See n 15 of this opinion. Amicus cites *Price v Hopkin*, 13 Mich 318 (1865), and *Lukazewski v Sovereign Camp of the Woodmen of the World*, 270 Mich 415; 259 NW 307 (1935), in support of the claim that Michigan case law has a "long-standing policy" of disregarding "unreasonable" contractual limitations periods. However, both cases are distinguishable.

In *Price*, the Legislature shortened a statute of limitations from twenty to fifteen years, giving the amendment retroactive effect. The plaintiff's grantor "was entitled by the existing statutes to bring her action within twenty years," but the statutory amendment immediately severed her cause of action. *Price, supra* at 323-324. Justice Cooley held that the retroactive statutory amendment was unconstitutional as violative of due process because it annihilated a vested right without permitting a "reasonable time" to bring the lawsuit. *Id.* at 324-328.

Likewise, *Lukazewski* is also distinguishable. There, the plaintiff was the beneficiary of a life insurance policy that required "proof of the insured's actual death." The policy also required that all lawsuits be commenced within one year from the date of death. The insured disappeared in 1925, but proof of his death was not established until 1932. The defendant "denied liability on the ground that both the contractual and statutory limitations" had expired. *Lukazewski, supra* at 417-418.

(continued…)

16

Likewise, there is no Michigan statute explicitly prohibiting contractual provisions that reduce the limitations period in uninsured motorist policies. The Legislature has proscribed shortened limitations periods in only one specific context: life insurance policies. MCL 500.4046(2).[29]

---

(…continued)

The *Lukazewski* Court held that, because the policy required affirmative proof of the decedent's death, the one-year limitations period would not begin to run until the death was discovered. The *Lukazewski* Court utilized the doctrine of judicial tolling, which is not at issue in the present case, to suspend the running of the contractual limitations period. However, it is unclear why the contractual limitations period was considered at all, as the contract provision violated the law. 1917 PA 256 was enacted four years before the issuance of the life insurance policy. 1917 PA 256, part 3, ch 2, § 4, contains a provision that is substantively identical to our current MCL 500.4046(2), see n 29 of this opinion. Thus, because the policy required actual proof of death, the cause of action did not accrue until death could be proven. The plain language of the statute provided the plaintiff six years *from the time the cause of action accrued* to file suit.

[29]  MCL 500.4046 states in pertinent part:

No policy of life insurance other than industrial life insurance shall be issued or delivered in this state if it contain [sic] any of the following provisions:
* * *
(2) A provision limiting the time within which any action at law or in equity may be commenced to less than 6 years after the cause of action shall accrue[.]

17

Notwithstanding the fact that the Commissioner approved for use the contract at issue in this case, the Commissioner now argues to this Court that MCL 500.2254 precludes contractual periods of limitations that are less than six years. The statute provides in part:

> No article, bylaw, resolution or policy provision adopted by any life, disability, surety, or casualty insurance company doing business in this state prohibiting a member or beneficiary from commencing and maintaining suits at law or in equity against such company shall be valid and no such article, bylaw, provision or resolution shall hereafter be a bar to any suit in any court in this state: Provided, however, That any reasonable remedy for adjudicating claims established by such company or companies shall first be exhausted by the claimant before commencing suit: Provided further, however, That the company shall finally pass upon any claim submitted to it within a period of 6 months from and after final proofs of loss or death shall have been furnished any such company by the claimant.

The plain language of the statute states that "[n]o . . . policy provision . . . *prohibiting* a member or beneficiary from commencing and maintaining [a lawsuit] against [the insurer] . . . shall be valid . . . ." (Emphasis added.) The common definition of "prohibit" is "to forbid by authority or command."[30] Clearly, the statute proscribes contractual provisions that forbid or preclude

---

[30] *New International Dictionary of the English Language* (1954), p 1978.

18

the commencement or maintenance of a lawsuit. The statute does not, however, bar the imposition of conditions that may be placed on the commencement and maintenance of a lawsuit.[31]

While nothing in our statutes explicitly addresses contractually shortened limitations periods outside the context of life insurance policies, we note that the Legislature *has* provided a mechanism to ensure the reasonableness of insurance policies issued in the state of Michigan.

MCL 500.2236(1) requires that all "basic insurance policy" forms be filed with the Commissioner's office and be approved by the Commissioner before a policy may be issued by an insurance company. If the Commissioner fails to act within thirty days after the policy form is submitted, the form is deemed approved. MCL 500.2236(1). One of the factors that the Commissioner may consider in determining whether to approve an insurance policy is the reasonableness of the conditions and exceptions contained therein. MCL 500.2236(5) and (6) provide:

---

[31] We note that Justice Kelly's construction of this provision would render invalid any contractual limitations provision in an insurance contract, even one that paralleled the applicable statutory limitations period. *Post* at 15-16.

19

(5) Upon written notice to the insurer, the commissioner *may* disapprove, withdraw approval or prohibit the issuance, advertising, or delivery of any form to any person in this state if it violates any provisions of this act, or contains inconsistent, ambiguous, or misleading clauses, or *contains exceptions and conditions that unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy.* The notice shall specify the objectionable provisions or conditions and state the reasons for the commissioner's decision. If the form is legally in use by the insurer in this state, the notice shall give the effective date of the commissioner's disapproval, which shall not be less than 30 days subsequent to the mailing or delivery of the notice to the insurer. If the form is not legally in use, then disapproval shall be effective immediately.

(6) If a form is disapproved or approval is withdrawn under the provisions of this act, the insurer is entitled upon demand to a hearing before the commissioner or a deputy commissioner within 30 days after the notice of disapproval or of withdrawal of approval. After the hearing, the commissioner shall make findings of fact and law, and either affirm, modify, or withdraw his or her original order or decision. [Emphasis added.]

Clearly, the Legislature has assigned the responsibility of evaluating the "reasonableness" of an insurance contract to the person within the executive branch charged with reviewing and approving insurance policies: the Commissioner of Insurance.[32] The statute

---

[32] In other contexts, the Legislature has *explicitly* assigned the responsibility of assessing the reasonableness of private contracts to the judiciary. See, for example, MCL 445.774a, which governs noncompetition covenants between an employer and an employee.

(continued…)

20

permits, but does not require, the Commissioner to disapprove or withdraw an insurance contract if the Commissioner determines that a condition or exception is unreasonable or deceptive. The decision to approve, disapprove, or withdraw an insurance policy form is within the sound discretion of the Commissioner. In this instance, the Commissioner has approved the Continental policy form containing the shortened limitations provision for issuance and use in the state of Michigan.[33]

Our courts have a very limited scope of review concerning the decisions made by the Commissioner. MCL 500.244(1) provides that an aggrieved person may seek judicial review of an "order, decision, finding, ruling, opinion, rule, action, or inaction" of the Commissioner as provided by the Administrative Procedures Act, MCL 24.201 *et seq.* MCL 24.306 provides:

> (1) Except when a statute or the constitution provides for a different scope of review, the court shall hold unlawful and set aside a decision or order of an agency if substantial rights of the petitioner have been

_____

(…continued)

[33] Justice Kelly erroneously reads MCL 500.2236(5) as rendering the Commissioner's *review* of a policy form discretionary. *Post* at 18-19. However, under that statutory subsection, the Commissioner's discretion extends only to the ability to "disapprove, withdraw approval or prohibit the issuance" of a policy form.

21

prejudiced because the decision or order is any of the following:

> (a) In violation of the constitution or a statute.

> (b) In excess of the statutory authority or jurisdiction of the agency.

> (c) Made upon unlawful procedure resulting in material prejudice to a party.

> (d) Not supported by competent, material and substantial evidence on the whole record.

> (e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.

> (f) Affected by other substantial and material error of law.

Here, plaintiffs have not challenged the decision of the Commissioner to allow issuance of the Continental policy, much less shown that the Commissioner's decision was arbitrary, capricious, or a clear abuse of discretion.[34] Accordingly, the explicit "public policy" of Michigan is that the reasonableness of insurance contracts is a matter for the executive, not judicial, branch of government. As such, the lower courts were not free to invade the

---

[34] Certainly, if the Commissioner were to determine subsequently that the provision at issue unreasonably affected the risk assumed in the policy, MCL 500.2236(5) and (6) provide the appropriate mechanism for withdrawing approval of the policy condition.

jurisdiction of the Commissioner and determine de novo whether Continental's policy was reasonable.

## C. ADHESION CONTRACTS

We turn finally to the trial court's conclusion that the policy was an "adhesion contract" and was therefore unenforceable. The trial court's ruling rested on the assumption that "adhesion contracts" are subject to a greater level of judicial scrutiny than other contracts— and, indeed, that so-called adhesion contracts need not be enforced if the court views them as unfair. The Court of Appeals reached a similar conclusion:

> We further note that the concern the Court expressed in *Herweyer* is present here as well. The insured had the option of accepting uninsured motorist coverage or rejecting it, but could not have bargained for a longer limitations period. Accordingly, the policy should receive close judicial scrutiny. [262 Mich App at 687][35]

---

[35] Justice Kelly charges that, in addressing the *Herweyer* adhesion contract issue, we are "engag[ing] in judicial activism". *Post* at 28. This is a strange accusation given that *both* the trial court and the Court of Appeals relied on the adhesion contract principles announced in *Herweyer* as a basis for invalidating the contractual limitations provision at issue. We think it unremarkable for this Court to address an issue that all the lower courts addressed. Moreover, because it was *Herweyer* that literally ignored nearly a century of contrary precedent in adopting a new rule of contractual construction (see n 15 of this

(continued…)

23

The contract construction approach of the lower courts is inconsistent with traditional contract principles. An "adhesion contract" is simply that: a *contract*.[36] It must be enforced according to its plain terms unless one of the traditional contract defenses applies.

Indeed, a careful examination of our contract jurisprudence reveals that the "adhesion contract doctrine" existed in Michigan solely in dicta until it was implicitly adopted by this Court in *Herweyer v Clark Hwy Services, Inc*. Moreover, it was adopted in *Herweyer* without substantive analysis, and without reference to and in contravention of more than one hundred years of contrary case law from this Court.

Before turning to the state of the "adhesion contract doctrine" in our jurisprudence, it is important to begin

---

(…continued)
opinion), the claim of "judicial activism" would seem most accurately applied to the *Herweyer* majority.

[36] There are many descriptive labels that are used to categorize species of contracts: "unilateral," see, e.g., *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 138 n 9; 666 NW2d 186 (2003), "executory," see, e.g., *Kolton v Nassar*, 358 Mich 154, 156; 99 NW2d 362 (1959), "installment," *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 532 n 5; 676 NW2d 616 (2004), etc. The fact that a particular label is attached to a contract does not exempt the contract from the application of standard contract law principles.

24

with a sense of how the notion of an "adhesive" contract arose in the first place.  The term "adhesion contract" was originally coined simply as a descriptive label for a common contract practice in the insurance industry.  The term was introduced in a 1919 law review article by University of Colorado Law School professor Edwin W. Patterson to describe a life insurance policy term requiring "delivery of the policy to the applicant" before the policy became effective.[37] Professor Patterson made the observation that "[l]ife-insurance contracts are contracts of 'adhesion.' The contract is drawn up by the insurer and the insured, who merely 'adheres' to it, has little choice as to its terms."[38] Patterson noted that "a majority of the courts have strictly enforced" such contractual stipulations, although some courts had "executed successful flanking movements" to find either that the insurer had waived the requirement, or that the policy had been delivered.[39] Thus, the original designation of "adhesion contract" described a *type* of contract, but did not suggest

---

[37]    Patterson, *The delivery of a life-insurance policy,* 33 Harv L R 198 (1919).

[38]    *Id*. at 222.

[39]    *Id*. at 221.

that such a description rendered the contract or its provisions unenforceable.

It was not until a quarter-century later that Patterson's label for life insurance contracts evolved into something resembling a "doctrine." In 1943, Yale Law School Professor Friedrich Kessler expanded on Patterson's description of practices in the life insurance industry to argue that courts should simply refuse to enforce unfair provisions of "adhesion contracts" rather than utilize traditional contract law principles.[40] While conceding that "society as a whole ultimately benefits from the use of standard contracts," Professor Kessler nonetheless maintained that such contracts were typically used by enterprises with "strong bargaining power," and that the "weaker party" frequently could not "shop around for better terms, either because the author of the standard contract [had] a monopoly" or because all competitors used the same clauses.[41] Kessler expressed concern that "powerful industrial and commercial overlords" would impose "a new

---

[40] Kessler, *Contracts of adhesion—some thoughts about freedom of contract,* 43 Colum L R 629 (1943). Kessler advocated that the "task of adjusting" contract law as it applied to adhesion contracts had to "be faced squarely and not indirectly." *Id.* at 637.

[41] *Id.* at 632.

feudal order of their own making upon a vast host of vassals."[42]

While noting that "freedom of contract has remained one of the firmest axioms in the whole fabric of the social philosophy of our culture,"[43] Kessler asserted that the meaning of "freedom of contract" varied with "the social importance of the type of contract and with the degree of monopoly enjoyed by the author of the standardized contract."[44] Thus, Kessler advocated nonenforcement of clauses contained in standardized contracts, but *only* where the type of contract was of sufficient "social importance" and where the author of the contract enjoyed a monopoly over the socially important good or service.

The groundwork for the "adhesion contract doctrine" was thus laid in academia, first in Patterson's positive analysis and then in Kessler's normative article. In Michigan, the notion was first imported into our case law in 1970. In *Zurich Ins Co v Rombough*,[45] the issue to be determined was whether an insurer had a duty to defend when

---

[42]    *Id*. at 640.

[43]    *Id*. at 641.

[44]    *Id*. at 642.

[45]    384 Mich 228; 180 NW2d 775 (1970).

its policy contained two apparently conflicting provisions.[46] The opinion noted that "[i]t is elemental insurance law that ambiguous policy provisions must be construed against the insurance company and most favorably to the premium-paying insured."[47] After noting this legal principle, the *Rombough* Court cited the following language from a California Supreme Court case to further support its rule of construction:

> Justice Tobriner, writing for the California Supreme Court in the case of *Gray* v. *Zurich Insurance Company* (1966), 65 Cal 2d 263 (54 Cal Rptr 104, 419 P2d 168), construing similar provisions, said:

> "In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.

> "*These principles of interpretation of insurance contracts have found new and vivid restatement in the doctrine of the adhesion contract.* As this court has held, a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more

---

[46] The policy contained an exclusion clause, indicating that the policy did not apply if insured vehicles were "used to carry property in any business." *Id.* at 230. The policy also contained a provision indicating that the company would provide a defense for any lawsuit even if the suit was "groundless, false or fraudulent." *Id.* at 231.

[47] *Id.* at 232.

powerful bargainer to meet its own needs, and offered to the weaker party on a 'take it or leave it basis' carries some consequences that extend beyond orthodox implications. Obligations arising from such a contract inure not alone from the consensual transaction but from the relationship of the parties.

"Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect."[48]

The *Rombough* Court concluded by purporting to "adopt" the reasoning of *Gray v Zurich*, holding that the policy language was "sufficiently ambiguous" to require plaintiff to provide a defense.[49]

Thus, the term "adhesion contract" was first introduced in Michigan jurisprudence in support of the rule of *contra proferentem*,[50] wherein contract terms are

---

[48]   *Id*. at 232-233. The practice of interpreting contracts on the basis of reasonable expectations rather that the plain language of the contract was repudiated by this Court in *Wilkie, supra* at 63.

[49]   *Rombough, supra* at 234.

[50]   See also *Klapp v United Ins Group Agency, Inc,* 468 Mich 459; 663 NW2d 447 (2003) (discussing *contra proferentem* as a rule of legal effect, to be utilized only after all conventional means of contract interpretation have been applied).

construed against the drafter in the event of an ambiguity to meet the "reasonable expectations" of the insured. However, because *Rombough* was decided on the basis of *contra proferentem*—a rule of interpretation providing that truly ambiguous contractual language is to be construed against the drafter[51]—its language regarding adhesion contracts is, as we stated in *Wilkie,*[52] properly classified as obiter dicta.

Subsequently, in *Cree Coaches, Inc v Panel Suppliers, Inc,*[53] this Court referred again to the "adhesion contract" concept. The defendant in *Cree Coaches* had constructed a building for the plaintiff pursuant to a contract that limited the warranty to one year after the contract was completed. Six years later, the building collapsed from the weight of snow. In *upholding* the provisions limiting the plaintiff's warranty claims and the warranty period, the Court noted in dicta—and without analysis—that the Court did not regard the construction contract "as a contract of adhesion from which public policy would grant relief."[54]

---

[51]     See, e.g., *Twichel, supra* at 535 n 6.

[52]     *Wilkie, supra* at 55-56.

[53]     384 Mich 646; 186 NW2d 335 (1971).

[54]     *Id*. at 649.

(continued…)

This digression was cryptic at best, because this Court had never before declined to enforce an "adhesion contract."

The term "adhesion contract" was discussed again a decade later in *Camelot Excavating Co, Inc v St Paul Fire & Marine Ins Co*.[55] In his concurring opinion, Justice Levin agreed with the majority that a clause in a construction insurance bond limiting the time within which the insured could bring suit to one year was enforceable. He stated, however, that "[a]n adhesion contract-such as most contracts of insurance-in which the shortened period has not actually been bargained for, or which operates to defeat the claim of an intended beneficiary not involved in the bargaining process," would "present a different case."[56] Again, the basis for Justice Levin's assertion is unclear, because characterization of an agreement as an adhesive contract had never before been pivotal in the Court's analysis or enforcement of a contract.

The development of the notion that adhesion contracts were subject to different standards of enforcement was dealt a significant blow in *Raska v Farm Bureau Mut Ins Co*

_____

(…continued)

[55]    410 Mich 118; 301 NW2d 275 (1981).

[56]    *Id*. at 142-143.

31

*of Michigan*.[57] There, the plaintiff brought suit for breach of an automobile policy and for a declaratory judgment that an "owned automobile" exclusion was ambiguous and should be construed against the insurer, and was void as contrary to public policy. This Court not only *enforced* the contractual policy exclusion, but held that "[a]*ny* clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy."[58] In dissent, Justice Williams stated that he would have declined to enforce the contractual exclusion because "an insurance contract, as a contract of adhesion, is construed in favor of the insured," as well as because of the "reasonable expectations" of the insured.[59] *Raska*, therefore, stands for the proposition that an insurance contract must be interpreted like any other contract: according to its plain unambiguous terms.

This Court's first attempt at describing the elements of the adhesion contract doctrine—a doctrine the Court had yet to adopt—was the plurality opinion in *Morris v*

---

[57]    412 Mich 355; 314 NW2d 440 (1982).

[58]    *Id*. at 361-362 (emphasis added).

[59]    *Id*. at 364.

*Metriyakool.*[60] There, the plaintiff signed an arbitration agreement upon admission to the hospital for medical treatment. The hospital presented the arbitration agreement pursuant to the former medical malpractice arbitration act (MMAA).[61] At issue was the question whether the MMAA was unconstitutional as violative of the plaintiff's due process rights. After determining that the act did not implicate due process concerns, Justice Kavanagh, joined by Justice Levin, rejected the plaintiff's assertion that the contract was one of adhesion, holding:

> Contracts of adhesion are characterized by standardized forms prepared by one party which are offered for rejection or acceptance without opportunity for bargaining and under the circumstances that the second party cannot obtain the desired product or service except by acquiescing in the form agreement. Regardless of any possible perception among patients that the provision of optimal medical care is conditioned on their signing the arbitration agreement, we believe that the sixty-day rescission period, of which patients must be informed, fully protects those who sign the agreement. The patients' ability to rescind the agreement after leaving the hospital allows them to obtain the desired service without binding them to its terms. *As a result, the agreement cannot be considered a contract of adhesion.* [62]

---

[60]    418 Mich 423; 344 NW2d 736 (1984).

[61]    Former MCL 600.5040 *et seq.*

[62]    *Id*. at 440 (citations omitted; emphasis added). Justices Kavanagh and Levin further determined that the arbitration agreement was not "unconscionable" because it
                                        (continued…)

Writing separately, Justice Ryan, joined by Justice Brickley, held that the MMAA did not violate due process concerns because there was no state action. In addressing the plaintiff's claim that the arbitration agreement was an adhesion contract, Justice Ryan stated:

> A contract of adhesion is a contract which has some or all of the following characteristics: the parties to the contract were of unequal bargaining strength; the contract is expressed in standardized language prepared by the stronger party to meet his needs; and the contract is offered by the stronger party to the weaker party on a "take it or leave it" basis. Therefore, the essence of a contract of adhesion is a nonconsensual agreement forced upon a party against his will. [63]

Justice Ryan agreed with the majority, however, that the contracts at issue in *Morris* were not adhesion contracts. Thus, while a majority of the *Morris* Court agreed that the contracts at issue were not contracts of adhesion, a majority could not agree on what, in fact, made a contract one of adhesion.[64]

---

(…continued)
was "not a long contract" and because arbitration was "the essential and singular nature of the agreement." *Id.* at 441.

[63]     *Id.* at 471-473 (citation omitted).

[64]     Justice Williams concurred with Justice Kavanagh on the ground of constitutionality only, while Justice
(continued…)

The plurality opinion of *Powers v Detroit Automobile Inter-Ins Exch*[65] asserted that *all* insurance contracts are adhesion contracts: nonnegotiated, take-it-or-leave-it, standardized forms, drafted by "insurance and legal experts of a state, national, or international organization, hundreds and maybe thousands of miles away."[66]   The plurality opinion utilized the now-repudiated doctrine of reasonable expectations to resolve the case,[67] noting that an ambiguity was not a necessary precondition for invoking that doctrine. Thus, rather than assessing whether the contract was indeed adhesive, the *Powers* plurality opinion decreed that all insurance contracts were contracts of adhesion, applying the reasonable expectations doctrine without regard to ambiguity.

---

(…continued)
Cavanagh issued a dissent addressing only the constitutional issue. Justice Boyle did not participate in the resolution of the case.

[65]   427 Mich 602; 398 NW2d 411 (1986), overruled by *Wilkie, supra* at 63.

[66]   *Id.* at 608.   Only Justice Archer joined Justice Willams's opinion. Justices Brickley and Cavanagh concurred in the result only.

[67]   See *Wilkie, supra.*

The concept of "adhesion contracts" took yet another turn in *Auto Club Ins Ass'n v DeLaGarza*.[68] The *DeLaGarza* majority concluded that the insurance policy at issue was ambiguous and was therefore to be construed "against the drafter of the provision and in favor of coverage."[69] Again, in dicta, the Court endorsed the notion that certain contracts are adhesive and are therefore to be construed in favor of the insured.[70]

---

[68] 433 Mich 208; 444 NW2d 803 (1989).

[69] *Id.* at 218.

[70] *Id.* at 215 n 7, noting the "judicial predisposition toward the insured," and quoting 7 Williston, Contracts (3d ed), § 900, pp 19-20:

> "The fundamental reason which explains this and other examples of judicial predisposition toward the insured is the deep-seated, often unconscious but justified feeling or belief that the powerful underwriter, having drafted its several types of insurance 'contracts of adhesion' with the aid of skillful and highly paid legal talent, from which no deviation desired by an applicant will be permitted, is almost certain to overreach the other party to the contract. The established underwriter is magnificently qualified to understand and protect its own selfish interests. In contrast, the applicant is a shorn lamb driven to accept whatever contract may be offered on a 'take-it-or-leave-it' basis if he wishes insurance protection."

Finally, in *Herweyer v Clark Hwy Services, Inc,*[71] this Court declined to enforce the plain language of a contract arguably because the contract at issue was adhesive. *Herweyer* concerned the validity of a shortened limitations provision in an employment contract and the application of a saving clause that required enforcement of the contract "as far as legally possible." In concluding that the six-month limitations period in the contract at issue was unenforceable, *Herweyer* cited Justice Levin's concurring opinion in *Camelot*:

> In *Camelot*, Justice Levin expressed concerns about the development of a rule authorizing contractually shortened periods of limitation. He reasoned:
>
> "The rationale of the rule allowing parties to contractually shorten statutory periods of limitation is that the shortened period is a bargained-for term of the contract. Allowing such bargained-for terms may in some cases be a useful and proper means of allowing parties to structure their business dealings.
>
> "In the case of an adhesion contract, however, where the party ostensibly agreeing to the shortened period has no real alternative, this rationale is inapplicable."[72]

Solely on the basis of Justice Levin's concurring opinion in *Camelot*, the *Herweyer* Court indicated—for the first time

---

[71]    455 Mich 14; 564 NW2d 857 (1997).

[72]    *Herweyer, supra* at 20-21 (citation omitted).

in this Court's history—that a so-called "adhesion contract" was unenforceable simply because of the disparity in the contracting parties' "bargaining power":

> We share Justice Levin's concerns. Employment contracts differ from bond contracts. An employer and employee often do not deal at arms length when negotiating contract terms. An employee in the position of plaintiff has only two options: (1) sign the employment contract as drafted by the employer or (2) lose the job. Therefore, unlike in *Camelot* where two businesses negotiated the contract's terms essentially on equal footing, here plaintiff had little or no negotiating leverage. *Where one party has less bargaining power than another, the contract agreed upon might be, but is not necessarily, one of adhesion, and at the least deserves close judicial scrutiny.*[73]

The *Herweyer* Court did not cite a single majority opinion of this Court to support its conclusion. More astonishingly, the majority failed to recognize—much less distinguish or overrule—more than a century of contrary case law belying its conclusion that a shortened limitations period was unenforceable.[74]

The preceding analysis shares many similarities with our decision in *Wilkie*, in which we also sought to clarify this state's contract jurisprudence. As in *Wilkie*,

---

[73] *Id.* at 21 (emphasis added).

[74] See n 15 of this opinion; see also *Tom Thomas, supra* at 592 n 4.

analyzing the concept of adhesive contracts in our jurisprudence requires that we confront "a confused jumble of ignored precedent, silently acquiesced to plurality opinions, and dicta, all of which, with little scrutiny, have been piled on each other to establish authority."[75]

Here, this "confused jumble" is exemplified by *Herweyer,* which held for the first time in our contract jurisprudence that an adhesion contract is subject to "close judicial scrutiny" and may be voided if the contract fails to meet the court's satisfaction. This holding was inconsistent not only with a century of case law to the contrary,[76] but with the very principles upon which that jurisprudence is based—namely, freedom of contract and the liberty of each person to order his or her own affairs by agreement.

Today we are faced with a choice. We may follow *Herweyer* and its summary conclusion that "[w]here one party has less bargaining power than another, the contract agreed upon might be, but is not necessarily, one of adhesion, and at the least deserves close judicial scrutiny."[77]  Or we

---

[75]     *Wilkie, supra* at 60.

[76]     See n 15 of this opinion.

[77]     *Herweyer, supra* at 21.

(continued…)

may, consistently with the many cases that *Herweyer* presumptively displaced without overruling them, hold that an adhesion contract is simply a type of contract *and* is to be enforced according to its plain terms just as any other contract. We choose the latter course because it is most consonant with traditional contract principles our state has historically honored.

As with any contract, the "rights and duties" of a party to an adhesion contract are "derived from the terms of the agreement."[78] A party may avoid enforcement of an "adhesive" contract only by establishing one of the traditional contract defenses, such as fraud, duress, unconscionability, or waiver.[79] As we stated in *Raska,*[80] and reaffirmed in *Wilkie:*[81]

> The expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable. If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no

---

(…continued)

[78] *Wilkie, supra* at 62.

[79] See n 23 of this opinion.

[80] *Raska, supra* at 362-363.

[81] *Wilkie, supra* at 63.

contract at all for there was no meeting of the minds.

But to allow such a person to bind another to an obligation not covered by the contract as written because the first person thought the other was bound to such an obligation is neither reasonable nor just.

Therefore, we hold that it is of no legal relevance that a contract is or is not described as "adhesive." In either case, the contract is to be enforced according to its plain language. Regardless of whether a contract is adhesive, a court may not revise or void the unambiguous language of the agreement to achieve a result that it views as fairer or more reasonable.[82]

---

[82] In dissent, Justice Kelly opines that adhesion contracts should be viewed "with skepticism" because "[m]ost people simply do not have the opportunity, time, or special ability to read the policy before agreeing to it." *Post* at 23, 25. However, an insured's failure to read his or her insurance contract has never been considered a valid defense. This Court has historically held an insured to have knowledge of the contents of the policy, in the absence of fraud, even though the insured did not read it. See *Cleaver v Traders' Ins Co*, 65 Mich 527; 32 NW 660 (1887); *Wierengo v American Fire Ins Co*, 98 Mich 621; 57 NW 833 (1894); *Snyder v Wolverine Mut Motor Ins Co*, 231 Mich 692; 204 NW 706 (1925); *Serbinoff v Wolverine Mut Motor Ins Co*, 242 Mich 394; 218 NW 776 (1928); *House v Billman*, 340 Mich 621; 66 NW2d 213 (1954). Additionally, the Commissioner is precluded from approving an insurance policy that fails to obtain a prescribed "readability score" as set forth in MCL 500.2236(3).

The term "adhesion contract" may, as Professor Patterson originally intended, be used to describe a contract for goods or services offered on a take-it-or-leave-it basis. But it may not be used as a justification for creating any adverse presumptions or for failing to enforce a contract as written. To the extent that *Herweyer* held to the contrary, it is overruled.[83]

In this case, plaintiffs do not argue that they were fraudulently induced to sign their agreement with defendant, that they entered into the contract under duress, or that any other traditional contract defense applies.[84] Therefore, irrespective of whether their contract is labeled "adhesive" under Kessler's standard, the competing *Morris* standards, or any other definition of

---

[83] Justice Kelly believes that overruling *Herweyer* represents a "radical change of the law," and that this Court should continue to "right the wrongs of adhesion contracts." *Post* at 27. However, as stated previously, the dissent overlooks the fact that *Herweyer* created a "radical change of the law" in Michigan.

[84] Justice Kelly suggests that there is never a meeting of the minds with a standardized form contract "[i]f the consumer does not read and comprehend the individual clauses of the contract . . . ." *Post* at 23. If this is indeed the case, then *no contract exists at all*. See *Quality Products*, *supra* at 372 ("Where mutual assent does not exist, a contract does not exist.") If the contract does not exist, there is nothing for a court to "revise."

the term, we must enforce the plain language of that agreement.[85]

## IV. CONCLUSION

Consistent with our prior jurisprudence, unambiguous contracts, including insurance policies, are to be enforced as written unless a contractual provision violates law or public policy. Judicial determinations of "reasonableness" are an invalid basis upon which to refuse to enforce unambiguous contractual provisions. Traditional defenses to enforcement of the contract at issue, such as waiver, fraud, or unconscionability, have neither been pled nor proven. Moreover, nothing in our law or public policy precludes the enforcement of the contractual provision at issue. Finally, in the specific arena of insurance contracts, the Legislature has enacted a mechanism whereby policy provisions may be scrutinized and rejected on the basis of reasonableness. This responsibility, however, has been explicitly assigned to the Commissioner. The Commissioner has approved the policy form at issue.

---

[85] We are at a loss to understand Justice Weaver's dissent. Nothing in this opinion breaks new ground. Justice Weaver's objection to the proposition that an insurance contract be enforced in accordance with its plain terms, just as any other contract, is a proposition found in *Raska, Wilkie*, and *Klapp, supra*. We do not purport to address the laundry list of issues raised in her dissent.

43

Plaintiffs have not challenged in the appropriate forum that this action was an abuse of discretion.

Accordingly, we reverse the Court of Appeals decision and remand for entry of summary disposition in favor of defendant.

Robert P. Young, Jr.
Clifford W. Taylor
Maura D. Corrigan
Stephen J. Markman

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

SHIRLEY RORY and ETHEL WOODS,

    Plaintiffs-Appellees,

v                                                                No. 126747

CONTINENTAL INSURANCE COMPANY,
also known as CNA INSURANCE COMPANY,

    Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

I dissent today because the majority has come to what I believe to be the incorrect conclusion on nearly every count. Not only does it reach the wrong result in this case, it takes a drastic step in the wrong direction with respect to contract law in general. The majority's decision constitutes a serious regression in Michigan law, and it gives new meaning to the term "judicial activism." Therefore, I cannot let it pass without comment.

It is a legitimate exercise for courts to review the reasonableness of contractual clauses that limit the period during which legal actions can be brought. Courts have conducted reviews of this type for well over a century. These reviews constitute a necessary step in ensuring

accurate enforcement of the intent of parties to a contract.

Moreover, in deciding this case, it is unnecessary to reach the issue of adhesion contracts. Yet the majority does so, apparently using this dispute as a vehicle to reshape the law on adhesion contracts more closely to its own desires. I believe that the scrutiny and protections offered by traditional adhesion contract law offer appropriate safeguards for the people of this state. Therefore, I would leave that law unmolested and would affirm the decision of the Court of Appeals.

## I. THE LONG HISTORY OF JUDGING LIMITATIONS PERIODS FOR REASONABLENESS

The majority opinion includes an extensive discussion of what its author believes to be the history of the "reasonableness doctrine" in Michigan. It effectively concludes that this Court created new law when it evaluated a shortened limitations period for reasonableness in *Herweyer v Clark Hwy Services*, 455 Mich 14, 20; 564 NW2d 857 (1997), *Armand v Territorial Constr, Inc*, 414 Mich 21, 27-28; 322 NW2d 924 (1982), *Camelot Excavating Co, Inc v St Paul Fire & Marine Ins Co,* 410 Mich 118; 301 NW2d 275 (1981), and *Tom Thomas Org, Inc v Reliance Ins Co,* 396 Mich 588, 592; 242 NW2d 396 (1976). This is not accurate.

2

It has long been the law that all limitations periods are subject to judicial review for reasonableness. Statutes of limitations enacted by the Legislature must be subject to such review. "Generally speaking, the time determined by the legislature within which an action may be brought is constitutional *where it is reasonable*." 54 CJS, Limitations of Actions, § 5, p 23. (Emphasis added.) This Court recognized and applied this rule more than 140 years ago when it wrote:

> [T]he legislative authority is not so entirely unlimited that, under the name of a statute limiting the time within which a party shall resort to his legal remedy, all remedy whatsoever may be taken away. . . . It is of the essence of a law of limitation that it shall afford a reasonable time within which suit may be brought[,] and a statute that fails to do this cannot possibly be sustained as a law of limitations . . . . [*Price v Hopkin*, 13 Mich 318, 324-325 (1865) (citations omitted).]

The essential reasoning behind this rule is that an unreasonable limitations period offers an aggrieved party no recourse to the courts. And it unfairly divests that party of a right that it supposedly provided. 54 CJS, Limitations of Actions, § 5, p 24.

For almost 140 years, this same rule and reasoning were applied to limitations periods created both by a contract and by a statute.

3

> [P]arties to a contract may, by an express provision therein, provide another and different period of limitation from the provided statute, and . . . such limitation, if reasonable, will be binding and obligatory upon the parties. [1 Wood, Limitation of Actions (4th ed, 1916), § 42, p 145.]

This rule of law was generally accepted and widely cited by courts throughout the country. See *Longhurst v Star Ins Co*, 19 Iowa 364, 370-371 (1865), *Gulf, C & S F R Co v Trawick*, 68 Tex 314, 319-320; 4 SW 567 (1887), *Gulf, C & S F R Co v Gatewood*, 79 Tex 89, 94; 14 SW 913 (1890), *Sheard v United States Fidelity & Guaranty Co*, 58 Wash 29, 33-34; 107 P 1024 (1910), *Pacific Mut Life Ins Co v Adams*, 27 Okla 496, 503; 112 P 1026 (1910), *Fitger Brewing Co v American Bonding Co of Baltimore*, 127 Minn 330; 149 NW 539 (1914), *Gintjee v Knieling*, 35 Cal App 563, 565-566; 170 P 641 (1917), *Columbia Security Co v Aetna Accident & Liability Co*, 108 Wash 116, 120; 183 P 137 (1919), and *Page Co v Fidelity & Deposit Co of Maryland*, 205 Iowa 798; 216 NW 957 (1927).

The United States Supreme Court discussed a similar topic well over a century ago. In *Express Co v Caldwell*,[1] the Court considered a common carrier's right to enter into

---

[1] 88 US (21 Wall) 264; 22 L Ed 556 (1875).

4

a contract to limit its liability.[2]  It held that, while a common carrier could enter into such a contract, courts could review the contract provision for reasonableness. This review was deemed essential because carriers were in a position of advantage over members of the public requiring their service.  *Express Co, supra* at 267.

In 1865, the Iowa Supreme Court used similar reasoning when it subjected contractual limitations periods to a reasonableness review.  The court was asked to enforce a twelve-month limitations period under circumstances in which the necessary facts to bring a claim could not reasonably have been ascertained in twelve months.  It refused, saying that to do so would impute a dishonest purpose to the company.  *Longhurst*, *supra* at 371.

> By putting this construction upon the contract of insurance, you preserve the upright intent of the company intact. Whereas if you put the other construction upon it, you, by implication, charge, or perhaps it would be better to say, judicially determine, that the company granted a policy for a valuable consideration paid, which at the time, they had reason to believe, would be no risk to them and no protection to the insured, and thereby obtained money for themselves under false pretenses. True charity thinketh no evil. It is therefore right for us to presume, that it was the honest intent of the company, to insure the

---

[2] Under common law, a common carrier would act as an insurer against all loss or damage except that stemming from an act of God or "the public enemy." *Id*. at 266.

5

plaintiff's mechanic's lien upon the premises specified, against loss by fire, and, upon the other hand, that it was the expectation of the insured, in paying the required premium, that his policy would cover the loss and give him the requisite protection. [*Id.*]

From these cases, one can see that the reasonableness doctrine is far from a novel legal idea. It has a solid foundation well recognized by the courts of this country, most notably the United States Supreme Court.

Also from these cases, the necessity of having such a review becomes apparent. Courts have recognized that insurers are in a position of power and control over the people purchasing their product. Careful judicial review is imperative so that the power is not abused. *Express Co*, *supra*; *Longhurst*, *supra*. Moreover, this review is essential in order to accurately implement the intent of the contracting parties. Because the overriding intent of a contract of insurance is to provide protection, the contract should not be read so as to eliminate that protection unreasonably.[3] *Id.*; *Spaulding v Morse*, 322 Mass

---

[3] The majority argues that the best way to discern the intent of the parties is by using the language contained in the contract. But in truth, the majority's decision today indicates that this is the *only* way to discern their intent. I simply disagree, as does the majority of modern courts. As the great Learned Hand stated, "There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than

(continued…)

6

149, 152-153; 76 NE2d 137 (1947). Otherwise, the insurer would collect money without providing coverage.

Hence, application of the reasonableness rule of contractual construction is well founded and reasoned. And Michigan courts following this rule have wisely joined the general trend of all courts in this country. Rather than creating new law or diverting from established contractual interpretation principles, our Court in *Camelot* applied a very old and well tested legal rule.[4]

## II. MODERN COURTS DISCUSSION OF THE ISSUE AT HAND

The long-established rule that courts review contractual limitations periods for their reasonableness has not been abandoned in modern times. In fact, several state courts have faced the very issue presented in this

---

(…continued)
to read the words literally, forgetting the object which the document as a whole is meant to secure." *Central Hanover Bank & Trust Co v Comm'r of Internal Revenue*, 159 F2d 167, 169 (CA 2, 1947). I believe that courts should give effect to the actual intent of the parties as expressed through the document as a whole. The protections contracted for should not be unreasonably eliminated.

[4] It is true that cases decided before *Tom Thomas* and *Camelot* upheld contractual limitations periods without discussing reasonableness. But this does not mean that Michigan courts "eschewed" the principle. Likely, the issue was not raised in those cases. When Michigan courts had the issue actually before them, they followed the well-tested legal rule established by courts throughout the United States legal system, including by the Supreme Court.

case. Nearly every court that has considered an uninsured motorist insurance contract that limits the applicable statutory period of limitations has found the limitation unreasonable.

For example, in *Elkins v Kentucky Farm Bureau Mut Ins Co*,[5] the insurance contract limited an uninsured motorist claim to one year following the accident. This conflicted with the two-year statutory period of limitations for claims against a motorist. *Id*. The Kentucky court found the one-year limitations period unreasonable and refused to enforce it. It stated:

> [I]t makes no sense to allow two years (or more) to file a suit against an uninsured or underinsured tort-feasor and yet permit the insurer to escape liability if the suit involving it is not filed within one year. Such would not only be an unreasonably short time, but it would completely frustrate the no-fault insurance scheme. [*Id*. at 424.]

The Kentucky court noted that it was following the majority of courts that have ruled on the issue. See *Scalf v Globe American Cas Co*, 442 NE2d 8 (Ind App, 1982); *Sandoval v Valdez*, 91 NM 705; 580 P2d 131 (1978); *Signal Ins Co v Walden*, 10 Wash App 350; 517 P2d 611 (1973); *Burgo v Illinois Farmers Ins Co*, 8 Ill App 3d 259; 290 NE2d 371

---

[5] 844 SW2d 423 (Ky App, 1992).

(1972); *Nixon v Farmers Ins Exch*, 56 Wis 2d 1; 201 NW2d 543 (1972).

Therefore, the majority today has not only rejected the long-established rule regarding review for reasonableness, but it has also broken company with the majority of courts addressing the issue. This fact strongly suggests that the majority is not on the firm legal ground it claims. Rather, it is pushing Michigan law out on a tenuous ledge, distancing it from the law of our sister states.

### III. THE LIMITATIONS PROVISION UNDER REVIEW WAS UNREASONABLE

Given that the "reasonableness doctrine" has been so well established, it should be applied without hesitation to the facts of this case. A review of the facts demonstrates the shocking inequity of the one-year limitations provision in defendant's uninsured motorist insurances contract.

The section of the contract in question provides:

> We will pay compensatory damages which any *covered person* is legally entitled to recover from the owner or operator of an *uninsured motor vehicle* because of *bodily injury*:
>
> 1. Sustained by any *covered person;* and
>
> 2. Caused by an *accident* arising out of the ownership, maintenance or use of an *uninsured motor vehicle;*

9

> Claim or suit must be brought within 1 year from the date of the *accident*. [Emphasis in original.]

This Court in *Herweyer* articulated the three-pronged test for determining if a limitations clause is reasonable:

> It is reasonable if (1) the claimant has sufficient opportunity to investigate and file an action, (2) the time is not so short as to work a practical abrogation of the right of action, and (3) the action is not barred before the loss or damage can be ascertained. [*Herweyer*, *supra* at 20, citing *Camelot*, *supra*.]

All prongs of the test outlined in *Camelot* and *Herweyer* weigh against allowing a shortened limitations period in this case.

Plaintiffs did not have sufficient time to investigate and file an action. Under the contract, the liability for uninsured motorist coverage is triggered only once an uninsured motorist becomes liable for noneconomic loss pursuant to MCL 500.3135(1). Liability for noneconomic loss occurs only if the plaintiffs suffered "death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1). While death may be ascertainable at the time of the accident, the other two injuries are less readily identifiable.

A party may not know that his injury is permanent until considerable time elapses. During this time, he attends physical therapy and attempts to heal. This may

10

well take longer than a year. Quite often, an injured individual will do everything in his power to escape the label "permanently impaired." I believe that most individuals are willing to work for a living and will exert considerable effort to recover from an injury in order to return to work. The contractual limitation contained in defendant's insurance form discourages attempts at recovery. For these reasons, it is unreasonable and should be held to be against public policy.

Also, a party may not learn that he has a serious impairment until after one year has passed. Some injuries, especially soft tissue injuries, are difficult to diagnose. And proper diagnosis and determination of permanency may take a long time. The Legislature seems to have recognized this fact by enacting a three-year statutory period of limitations for bringing suits for noneconomic damages. Given these considerations, the first prong of the *Herweyer* test weighs against finding this limitation reasonable.

The one-year limitation also works as a practical abrogation of the right created by the insurance agreement. This is the second consideration under the *Herweyer* test. *Herweyer*, *supra* at 20. The best way that a plaintiff can find out if a party is uninsured is to sue him. If an insurance company presents a defense, then the party is

11

insured.  However, the time required to reach this point can easily exceed one year.

Under a one-year period of limitations, an insured injured in an automobile accident would be forced to immediately ascertain whether a serious impairment exists. He then would be obliged to file suit against the other motorist well before one year has elapsed.  This is because the case might have to progress through at least part of the discovery process for the injured person to determine if the other motorist is uninsured.  Then, the insured would have to make a claim with his insurance company.  In many instances, all this cannot be accomplished within one year.

The clause providing the one-year limitations period mandates that injured insureds bring suit immediately after their automobile accident.  This might be even before they determine if they have a permanent impairment.  In effect, the clause requires that baseless lawsuits be filed. Filing such a lawsuit might be the only way a party could claim the uninsured motorist coverage that he paid for. But this early filing still might not move the case along quickly enough to satisfy the one-year limitation.

This is exactly what happened to plaintiffs, Shirley Rory and Ethel Woods.  They did not know that the other

party to the accident was uninsured until suit had been brought and discovery was underway. They did not delay in the least in making their claim with defendant. They filed well within the limitations period for claims of noneconomic damages. But the majority would still leave them without the uninsured motorist coverage they paid for. Clearly, this is a practical abrogation of plaintiffs' rights.

That the one-year limitations clause abrogates plaintiffs' rights becomes even clearer when one contemplates that an insurer for the third party might deny coverage well into the suit. That insurer could determine that its insured should not receive coverage only after defending him for many months. This delayed notice would be outside the control of the injured motorist. But it could deny him the uninsured motorist coverage he paid for from his own insurer. If a third-party insurer waits for a year to deny coverage, the clause would absolutely bar the injured motorist from the benefit of his insurance. The majority simply ignores this inequity.[6]

Also, after one year, the injured party may still be receiving medical treatment. A permanent injury may not

---

[6] Some would see this ruling as an open invitation for insurance company gamesmanship.

yet have been diagnosed. A third-party insurance company could deny coverage at that point. The injured motorist would have done everything in his power to bring suit against the third party. But he would not be able to sustain a claim under his uninsured motorist insurance policy because the third-party insurer did not deny coverage until too late. The contractual limitations clause simply fails to give an adequate period in which to ascertain the loss or damage. *Id*.

Given that the clause providing a one-year limitations period is found wanting under all three prongs of the *Herweyer* test, it must be adjudged to be unreasonable. *Id*. Therefore, the trial court correctly denied summary disposition in this case and the Court of Appeals appropriately affirmed that decision.

IV. THE ONE-YEAR LIMITATIONS PERIOD AND MCL 500.2254

The majority concludes that the one-year limitations clause is not contrary to the law or to public policy. But to reach this conclusion, it relies on a strained reading of MCL 500.2254. I agree with the Commissioner of the Office of Financial and Insurance Services who filed an amicus curiae brief concluding that MCL 500.2254 forbids a one-year limitations clause.

14

MCL 500.2254 provides:

> Suits at law may be prosecuted and maintained by any member against a domestic insurance corporation for claims which may have accrued if payments are withheld more than 60 days after such claims shall have become due. *No article, bylaw, resolution or policy provision adopted by any life, disability, surety, or casualty insurance company doing business in this state prohibiting a member or beneficiary from commencing and maintaining suits at law or in equity against such company shall be valid and no such article, bylaw, provision or resolution shall hereafter be a bar to any suit in any court in this state*: Provided, however, That any reasonable remedy for adjudicating claims established by such company or companies shall first be exhausted by the claimant before commencing suit: Provided further, however, That the company shall finally pass upon any claim submitted to it within a period of 6 months from and after final proofs of loss or death shall have been furnished any such company by the claimant. [Emphasis added.]

Under the language of this statute, a policy provision may not prohibit a beneficiary from commencing and maintaining a suit. MCL 500.2254. But this is exactly what the one-year limitations clause does. After expiration of the one-year period, the beneficiary no longer is entitled to maintain a suit for uninsured motorist coverage, even though his claim is allowable by statute for another two years. The limitations clause contravenes the statute. This means it is contrary to Michigan law and Michigan public policy.

15

In order to support its position, the majority argues that nothing in the statute forbids conditions being placed on the commencement and maintenance of a lawsuit.  But such conditions are exactly what the statute speaks of.  It forbids a policy provision "*prohibiting a member or beneficiary from commencing and maintaining suits*[.]"  MCL 500.2254.  Any "condition" in a policy would be a policy provision.  Changing its label does not change what it is. Therefore, any condition prohibiting a beneficiary from commencing and maintaining a suit would equally violate the statute.[7]

In addition, the Legislature explicitly lists two "conditions" that are exceptions to the general rule in MCL 500.2254.  Insurance companies may include in their policy provisions these two "conditions":  (1) the claimant must exhaust any alternative remedies mandated by the policy, such as arbitration, and (2) the claimant must give the insurer six months to decide whether to honor the claim before the claimant may bring suit.  MCL 500.2254.  The

---

[7] The majority claims that my interpretation would render invalid a contractual limitations period that paralleled the applicable statutory limitations period. This is not true.  In such a situation, the contractual provision would not limit the commencement and maintenance of a lawsuit, but instead, the statute of limitations would.

16

inclusion of these two conditions indicates that the Legislature did not intend to allow any others.

This Court has long relied on the legal maxim *expressio unius est exlusio alterius*.[8] The maxim is a rule of construction that is a product of logic and common sense. *Feld v Robert & Charles Beauty Salon*, 435 Mich 352, 362; 459 NW2d 279 (1990), quoting 2A Sands, Sutherland Statutory Construction (4th ed), § 47.24, p 203. In fact, this Court long ago stated that no maxim is more uniformly used to properly construe statutes. *Taylor v Michigan Pub Utilities Comm*, 217 Mich 400, 403; 186 NW 485 (1922).

If exceptions such as the one-year limitations clause were permissible, it would be pointless for the Legislature to have listed only two exceptions in the statute. It would contravene the well established maxim of *expressio unius est exlusio alterius*. And it would write into the statute what the Legislature chose to omit. Therefore, I cannot agree with the majority's interpretation of MCL 500.2254.

V. APPROVAL OF INSURANCE FORMS BY THE COMMISSIONER

The majority argues that the Legislature assigned the task of evaluating an insurance provision's reasonableness

---

[8] This translates as "the expression of one thing is the exclusion of another."

17

to the Commissioner of the Office of Financial and Insurance Services.    It relies on MCL 500.2236(5), which provides:

> Upon written notice to the insurer, the commissioner *may* disapprove, withdraw approval or prohibit the issuance, advertising, or delivery of any form to any person in this state if it violates any provisions of this act, or contains inconsistent, ambiguous, or misleading clauses, or contains exceptions and conditions that unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy.   The notice shall specify the objectionable provisions or conditions and state the reasons for the commissioner's decision. If the form is legally in use by the insurer in this state, the notice shall give the effective date of the commissioner's disapproval, which shall not be less than 30 days subsequent to the mailing or delivery of the notice to the insurer. If the form is not legally in use, then disapproval shall be effective immediately. [Emphasis added.]

By using the term "may," the Legislature has signaled that what follows "may" is a discretionary act.   This contrasts with the use of the term "shall," which signals a mandatory act.   *Murphy v Michigan Bell Tel Co*, 447 Mich 93, 100; 523 NW2d 310 (1994).   Nothing in this statute indicates that, in granting this discretion to the commissioner, the Legislature intended to rob the courts of review of the same matter.[9]   Moreover, it could be argued

---

[9] The majority accuses me of reading the review of policy forms as discretionary.   That is not my argument.
(continued…)

18

that, by not making the commissioner's review mandatory, the Legislature acknowledged that a court's exercise of similar review is well-founded and appropriate.

The majority ignores the discretionary nature of the commissioner's review when it concludes that plaintiffs can challenge the one-year limitations clause only by challenging the approval of the insurance form. But the commissioner is not required to review "conditions that unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy." MCL 500.2236(5).

The majority's argument amounts to little more than a red herring. It is an attempt to distract from the patent inequity of its ruling today. Because the commissioner's review is discretionary, reference to MCL 500.2236(5) adds little to this discussion. And it does not justify the majority's decision to radically change existing law.

---

(…continued)
While the commissioner is required to review all forms, the discretionary nature of his disapproval means that his review for reasonableness is also discretionary. The statute would allow the commissioner to let a form enter into use even if he found terms within it to be unreasonable. The statute does not mandate disapproval when a portion of the form is unreasonable. Therefore, the review for reasonableness is discretionary.

## VI.   ADHESION CONTRACTS

Not content with overturning just one line of precedent used to protect the people of Michigan, the majority goes on to discuss the tangentially related topic of adhesion contracts.  It overrules the line of cases offering protection to Michiganians from such contracts and departs from well-established precedent and from the majority of other courts that have addressed the issue. Its decision also defies common sense.

### A.   THE HISTORY OF ADHESION CONTRACTS AND BALANCING THE INEQUITIES OF THESE CONTRACTS

In discussing the history of adhesion contracts, the majority misses one important point.  Before courts applied protections from adhesion contracts, they struggled to deal with the problems presented by form contracts.[10]  Although they did not always explicitly state what they were doing, they often acted in a way to balance out the inequities presented by such contracts.

---

[10] I would note that form contracts came into use only toward the end of the eighteenth century.  Meyerson, *The reunification of contract law:  The objective theory of consumer form contracts*, 47 U Miami L R 1263 (1993). Relatively speaking, it was a short time before there was discussion of treating them as contracts of adhesion. During the intervening time, courts found other ways to counterbalance the inequities of these one-sided contracts.

In his early work in the field, Professor Karl N. Llewellyn noted:

> [W]e have developed a whole series of semi-covert techniques for somewhat balancing these [form-contract] bargains. A court can "construe" language into patently not meaning what the language is patently trying to say. It can find inconsistencies between clauses and throw out the troublesome one. It can even reject a clause as counter to the whole purpose of the transaction. It can reject enforcement by one side for want of "mutuality," though allowing enforcement by the weaker side because "consideration" in some other sense is present. [Book review, *The standardization of commercial contracts in English and Continental Law, by O. Prausnitz*, 52 Harv L R 700, 702 (1939).][11]

Courts have long recognized the inherent problems of form contracts and attempted through various methods to compensate for their inequities. The great legal minds of the early twentieth century began to see the drawbacks of this "semi-covert" action, and they called for uniformity in the field. From this developed the concept and protections of the adhesion contract theory. Meyerson, *The reunification of contract law: The objective theory of consumer form contracts*, 47 U Miami L R 1263, 1277-1278 (1993).

Despite the majority's argument, the idea of balancing the inequities of form contracts (or what are now more

---

[11] See also Keeton*, Insurance law rights at variance with policy provisions*, 83 Harv L R 961, 968-973 (1970).

commonly known as "adhesion contracts") has been long recognized. And there is good reason for this longstanding recognition. Namely, the bargained-for exchange fundamental to traditional contracts simply does not exist in adhesion contracts.

As the Pennsylvania Supreme Court noted when abandoning the strict construction approach to which the majority regresses today:

> The rationale underlying the strict contractual approach reflected in our past decisions is that courts should not presume to interfere with the freedom of private contracts and redraft insurance policy provisions where the intent of the parties is expressed by clear and unambiguous language. We are of the opinion, however, that this argument, based on the view that insurance policies are private contracts in the traditional sense, is no longer persuasive. Such a position fails to recognize the true nature of the relationship between insurance companies and their insureds. An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured. The only aspect of the contract over which the insured can "bargain" is the monetary amount of coverage. [*Brakeman v Potomac Ins Co*, 472 Pa 66, 72; 371 A2d 193 (1977).]

The average person does not sit down and bargain for each of the terms in his insurance contract. Quite the opposite is true. He may never read his insurance policies. Most are long and contain nuanced subclauses virtually indecipherable to people not experienced in

22

contractual interpretation or insurance law. This is true despite the increased use of plain English in such policies. In most situations, the individual pays his insurance premiums and then receives the contract in the mail days or weeks later. Most people simply do not have the opportunity, time, or special ability to read the policy before agreeing to it.

And what incentive does the insurance industry have to assure that their insureds read their polices? If people were to read all the language in their insurance contracts, the insurance providers would be flooded with questions and requests to change clauses. It has been observed that "[i]f it is both unreasonable and undesirable to have consumers read these terms, courts should not fashion legal rules in a futile attempt to force consumers to read these terms[.]" Meyerson, *supra* at 1270-1271.

If the consumer does not read and comprehend the individual clauses of the contract, there can be no agreement on the particular terms in them. There can be no meeting of the minds. Moreover, when one side presents a contract on a take-it-or-leave-it basis and is in a place of considerable power over the other, there can be no bargained-for exchange. Hence, an outdated strict

23

construction policy of construing these agreements is utterly unworkable.[12]

It is for that reason that the majority of the courts in this country has disavowed the strict construction policy in construing contracts of adhesion.[13] Instead, they

[12] The majority contends that consumers should be assumed to know all the contents of their insurance policies. But it notes that without a meeting of the minds no contract exists. The purpose of modern judicial review of adhesion contracts is to balance the inequity that they present. Instead of either forcing a consumer to abide by a term that he never knew of or rejecting the entire contract, the court balances the inequities of the contract to enforce its overriding intent. Therefore, what was fairly bargained for is enforced and what the parties minds truly met on remains. But the majority, instead of continuing to balance these inequities, returns to the generally unworkable strict construction approach. In doing so, it ignores the true nature of adhesion contracts. *Brakeman, supra.*

[13] For but a few examples, see *Lechmere Tire & Sales Co v Burwick*, 360 Mass 718; 277 NE2d 503 (1972), *State Farm Mut Automobile Ins Co v Johnson*, 320 A2d 345 (Del, 1974), *Dairy Farm Leasing Co, Inc v Hartley*, 395 A2d 1135 (Me, 1978), *Jarvis v Aetna Cas & Surety Co*, 633 P2d 1359 (Alas, 1981), *State Farm Mut Automobile Ins Co v Khoe*, 884 F2d 401 (CA 9, 1989), *Jones v Bituminous Cas Corp*, 821 SW2d 798 (Ky, 1991), *Nieves v Intercontinental Life Ins Co*, 964 F2d 60 (CA 1, 1992), *Broemmer v Abortion Services of Phoenix, Ltd*, 173 Ariz 148; 840 P2d 1013 (1992), *Grimes v Swaim*, 971 F2d 622 (CA 10, 1992), *United States Fidelity & Guaranty Co v Sandt*, 854 P2d 519 (Utah, 1993), *Buraczynski v Eyring*, 919 SW2d 314 (Tenn, 1996), *Coop Fire Ins Ass'n v White Caps, Inc*, 166 Vt 355; 694 A2d 34 (1997), *Alcazar v Hayes*, 982 SW2d 845 (Tenn, 1998), *Andry v New Orleans Saints*, 820 So 2d 602 (La App, 2002), *Parilla v IAP Worldwide Services VI, Inc*, 368 F3d 269 (CA 3, 2004), and *Iberia Credit Bureau, Inc v Cingular Wireless LLC*, 379 F3d 159 (CA 5, 2004).

follow the more equitable and balanced modern trend of viewing adhesion contracts with skepticism. I believe it is a serious mistake for the majority to regress Michigan law away from this well-accepted modern trend that has been created to protect individuals.[14]

The majority contends that it bases its decision on the "freedom of contract and the liberty of each person to order his or her own affairs by agreement." *Ante* at 39. It also states that contracts "voluntarily and fairly made" should be enforced. *Ante* at 12. In making these statements, the majority either ignores or intentionally obfuscates the fact that adhesion contracts are not fairly made or bargained for by individuals managing their own affairs.

Instead, the majority is creating a rule that permits insurance companies to bargain *unfairly* so that they can maximize their financial profit. The burden of this rule

---

[14] The majority accuses the *Herweyer* Court of being the true judicial activists. It claims that *Herweyer* rejected "a century" of precedent. As noted, earlier in this opinion, this truly is not the case. Courts had been balancing the inequities of form contracts nearly since their inception. This Court in *Herweyer* merely followed that trend. It is only this majority that is reshaping Michigan law and clearly reversing longstanding precedent. In doing so, it is ignoring the current state of contract law and breaking away from the well-established modern trend of adhesion contract interpretation recognized throughout this country.

is carried by the average individual who has little, if any, bargaining power when purchasing insurance. The choice made by the majority regresses our judicial system by decades, if not centuries. It places the state back into the era when courts either used covert means of interpreting contracts or ignored equity altogether.

B. THE CONTINUED ATTACK ON INSURANCE CONTRACT PROTECTIONS

Today, the majority continues its attack on the well-developed protections created in insurance law that it started in *Wilkie v Auto-Owners Ins Co* 469 Mich 41; 664 NW2d 776 (2003). In *Wilkie*, the majority struck down, erroneously I believe, the doctrine of reasonable expectations. Adding this decision to *Wilkie*, the majority has now struck down all reasonable means of objectively interpreting insurance contracts. Without objective standards, courts cannot be expected to accurately discern the intent of the parties.

> An objective standard produces an essential degree of certainty and predictability about legal rights, as well as a method of achieving equity not only between insurer and insured but also among different insureds whose contributions through premiums create the funds that are tapped to pay judgments against insurers. [Keeton*, Insurance law rights at variance with policy provisions*, 83 Harv L R 961, 968 (1970).]

The abandonment of these important equitable considerations destabilizes the system. The only ones

benefited are the insurance companies. Those that are unscrupulous can now more easily create deliberately confusing insurance forms with hidden clauses that change the meaning of the policy. They may thereby collect payments for coverage that is wholly illusory without worry of interference from Michigan courts. I cannot agree with this position. As Justice Cavanagh once wisely stated:

> I object to [the majority's] attempt to distance itself from the policy choices inherent in its decision today. Simply put, the majority and I differ with regard to the policies that should guide the interpretation of insurance law. I would prefer not to disregard the manner in which the insurance industry operates. Though an adhesion contract may be a necessary ingredient in the trade, I cannot condone a doctrine of interpretation that all but ignores the potentially precarious effect on the bound party. [*Wilkie, supra* at 70 (Cavanagh, J., dissenting).]

This Court should not abandon the protections created to right the wrongs of adhesion contracts. I must dissent from its radical change of the law.

## VII. CONCLUSION

The reasonableness doctrine is well-established in the law. Judicial review constitutes a necessary step to ensure that the actual intent of parties to a contract is enforced. Therefore, it is inappropriate to overturn the various decisions that support the ability of courts to

27

review for reasonableness the shortening of limitations periods.

In this case, the one-year time limit was so short that it acted as a practical abrogation of the right to bring a lawsuit. Therefore, plaintiffs paid for coverage from which they could never benefit. In such a situation, the only proper action by the Court is to find the limitations period unreasonable.

In deciding this case, it is unnecessary to reach the issue of adhesion contracts. The majority, by venturing into this area of the law and using this case as a vehicle, subjects itself to claims that it engages in judicial activism. The scrutiny and protections offered by traditional adhesion contract law offer a necessary aegis for the people of this state. I see no reason to attack this fundamental tenet of our law.

Therefore, I would affirm the decision of the Court of Appeals.

Marilyn Kelly

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

SHIRLEY RORY AND ETHEL WOODS,

    Plaintiffs-Appellees,

v                                                            No. 126747

CONTINENTAL INSURANCE COMPANY,
also known as CNA INSURANCE COMPANY,

    Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

As the majority accurately observes, this Court is faced with a choice today. See *ante* at 39. This Court could continue to acknowledge the unique character of insurance agreements and follow well-reasoned precedent examining contractually shortened limitations periods for reasonableness. Or this Court could disregard the manner in which insurance agreements come into existence and abrogate the "reasonableness doctrine." Because the majority makes the wrong choice, I must respectfully dissent from today's decision and concur in the result reached by Justice Kelly's dissent.

As a general proposition, "[a]n insurance policy is much the same as any other contract." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992).

Accordingly, a clear and unambiguous insurance policy is usually applied as written. *New Amsterdam Cas Co v Sokolowski*, 374 Mich 340, 342; 132 NW2d 66 (1965); *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 111; 595 NW2d 832 (1999). This general principle, however, is subject to numerous caveats that are deeply rooted in our jurisprudence, including the following: where a contractual limitations provision shortens the otherwise applicable period of limitations, the provision must be reasonable to be enforceable. *Herweyer v Clark Hwy Services, Inc*, 455 Mich 14, 20; 564 NW2d 857 (1997). See also 44A Am Jur 2d, Insurance, § 1909, p 370; anno: *Validity of contractual time period, shorter than statute of limitations, for bringing action*, 6 ALR3d 1197.

As noted by the majority, there is little doubt that parties may generally contract for shorter periods of limitations, and this Court has enforced such provisions where they have been reasonable. To this end, this Court in *Herweyer*, *supra* at 20, rearticulated the following factors to assist our courts in determining whether a contractual limitations provision is reasonable:

> It is reasonable if (1) the claimant has sufficient opportunity to investigate and file an action, (2) the time is not so short as to work a practical abrogation of the right of action, and

(3) the action is not barred before the loss or damage can be ascertained.

In my view, this reasonableness inquiry is particularly fitting when insurance policies purport to shorten the otherwise applicable period of limitations. As Justice Levin once observed:

> The rationale of the rule allowing parties to contractually shorten statutory periods of limitation is that the shortened period is a bargained-for term of the contract. Allowing such bargained-for terms may in some cases be a useful and proper means of allowing parties to structure their business dealings.
>
> In the case of an adhesion contract, however, where the party ostensibly agreeing to the shortened period has no real alternative, this rationale is inapplicable. [*Camelot Excavating Co, Inc v St Paul Fire & Marine Ins Co,* 410 Mich 118, 141; 301 NW2d 275 (1981) (Levin, J., concurring).]

Nonetheless, the majority posits that the reasonableness inquiry no longer has any place in our jurisprudence because this inquiry undermines the parties' freedom of contract. In my view, however, such an approach ignores the manner in which the insurance industry operates. In this regard, I believe that the majority's approach is based on the fiction that the shortened

3

limitations period was a truly bargained-for term.[1]  In other words, I believe that the majority's entire premise must fail because it ignores the unique character of insurance agreements and disregards the notion that adhesion contracts inherently tend to "be a necessary ingredient in the trade . . . ."  *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 70; 664 NW2d 776 (2003) (Cavanagh, J.,

---

[1]  In the typical insurance agreement, Justice Levin prudently noted,

> [t]here is no meeting of the minds except regarding the broad outlines of the transaction, the insurer's desire to sell a policy and the insured's desire to buy a policy of insurance for a designated price and period of insurance to cover loss arising from particular perils (death, illness, fire, theft, auto accident, "comprehensive").  The details (definitions, exceptions, exclusions, conditions) are generally not discussed and rarely negotiated.
>
> The policyholder can, of course, be said to have agreed to whatever the policy says—in that sense his mind met with that of the insurer. Such an analysis may not violate the letter of the concept that a written contract expresses the substance of a meeting of minds, but it does violate the spirit of that concept.
>
> To be sure, contract law principles are not confined by the concept of a "meeting of the minds."  Nevertheless, a point is reached when the label "contract" ceases to fully and accurately describe the relationship of the parties and the nature of the transaction between insurer and insured.  [*Lotoszinski v State Farm Mut Automobile Ins Co*, 417 Mich 1, 14 n 1; 331 NW2d 467 (1982) (Levin, J., dissenting).]

4

dissenting).[2] Accordingly, I would not torture the term "adhesion contract" and turn a blind eye to the manner in which these adhesion contracts are made simply to bolster what is perceived as a preferred result. Instead, I would embrace, rather than divorce, reality and acknowledge how insurance policies typically come into existence. Therefore, I would affirm the decision of the Court of

---

[2] I must additionally note that, contrary to the majority's rationale, decisions such as *Camelot Excavating*, *Herweyer*, and *Tom Thomas Org, Inc v Reliance Ins Co,* 396 Mich 588, 592; 242 NW2d 396 (1976), were not groundbreaking. For example, 44A Am Jur 2d, Insurance, § 1909, pp 370-371 provides:

> In the absence of statutory regulation to the contrary, an insurance contract may validly provide for a limitation period shorter than that provided in the general statute of limitations, *provided that the interval allowed is not unreasonably short*. [Emphasis added.]

Section 1909 cites the following cases in support of this view: *Thomas v Allstate Ins Co*, 974 F2d 706 (CA 6, 1992) (applying Ohio law); *Doe v Blue Cross & Blue Shield United of Wisconsin*, 112 F3d 869 (CA 7, 1997); *Wesselman v Travelers Indemnity Co*, 345 A2d 423 (Del, 1975); *Phoenix Ins Co v Aetna Cas & Surety Co*, 120 Ga App 122; 169 SE2d 645 (1969); *Nicodemus v Milwaukee Mut Ins Co*, 612 NW2d 785 (Iowa, 2000) (contractual limitations provision in an insurance policy is enforceable if it is reasonable); *Webb v Kentucky Farm Bureau Ins Co*, 577 SW2d 17 (Ky App, 1978); *Suire v Combined Ins Co of America*, 290 So 2d 271 (La, 1974); *L & A United Grocers, Inc v Safeguard Ins Co*, 460 A2d 587 (Me, 1983) (in property insurance, a limit of one year from the time of loss is not unreasonably short); *O'Reilly v Allstate Ins Co*, 474 NW2d 221 (Minn App, 1991); *Commonwealth v Transamerica Ins Co*, 462 Pa 268; 341 A2d 74 (1975); *Donahue v Hartford Fire Ins Co*, 110 RI 603; 295 A2d 693 (1972); *Hebert v Jarvis & Rice & White Ins, Inc*, 134 Vt 472; 365 A2d 271 (1976).

5

Appeals and conclude that the shortened limitations period in this insurance policy is unreasonable and, thus, unenforceable.

I must also observe that my disagreement with the current majority with respect to the principles governing the interpretation of insurance policies is nothing new. See *Wilkie*, *supra*. I recognize that the majority's view in this case and others is theoretically consistent with the notion of freedom of contract. In the abstract, the majority's approach could arguably have some appeal. Nonetheless, while today's decision may placate the majority's own desire to demonstrate its self-described fidelity, I believe that the majority's position ignores how the insurance industry functions and discounts the effects today's decision will have on this state's citizens. Therefore, I must respectfully dissent from today's decision and concur in the result reached by Justice Kelly's dissent.

Michael F. Cavanagh

6

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

SHIRLEY RORY and ETHEL WOODS,

    Plaintiffs-Appellees,

v                                        No. 126747

CONTINENTAL INSURANCE COMPANY,
also known as CNA INSURANCE COMPANY,

    Defendant-Appellant.

_____

WEAVER, J. (*dissenting*).

I respectfully dissent from the majority opinion's holdings that the "insurance policies *are* subject to the same contract construction principles that apply to any other species of contract," and that "unless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." *Ante* at 2.

In so holding, the majority is eliminating over five decades' worth of precedent that created specialized rules of interpretation and enforcement for insurance contracts. These specialized rules recognize that an insured is not able to bargain over the terms of an insurance policy; indeed, it is common practice for the insured to receive

the actual terms of the contract, the insurance policy itself, only *after* having purchased the insurance. Further, in most cases the average consumer will not read the policy; the consumer will rely on the agent's representations of what is covered in the policy. Even if the insured were to read the policy, insurance policies are not easy to understand and contain obscure provisions, the meaning of which requires legal education to grasp.

The longstanding rules that the majority does away with by stating that insurance contracts are to be interpreted in the same way as any other contract include:

•Courts must interpret insurance policies from the perspective of an average consumer. The contract must be read using the ordinary language of the layperson, not using technical medical, legal, or insurance terms.[1] By contrast, the usual rule of contract interpretation is that "technical terms and words of art are given their technical meaning when used in a transaction within their technical field." 2 Restatement Contracts, 2d, ch 9, § 202, p 86. See also *Moraine Products, Inc v Parke, Davis & Co,* 43 Mich App 210, 213; 203 NW2d 917 (1972).

---

[1] "Insurance policies should be read with the meaning which ordinary layman would give their words." *Bowman v Preferred Risk Mut Ins Co*, 348 Mich 531, 547; 83 NW2d 434 (1957).

●If reading the contract one way provides that there is coverage, but reading it another way provides that there is not coverage under the same circumstances, then the contract is ambiguous and must be construed against its drafter and in favor of coverage.[2] This is different from general contract law, which finds a contract ambiguous "if its provisions may *reasonably* be understood in different ways." *Universal Underwriters Ins Co v Kneeland,* 464 Mich 491, 496; 628 NW2d 491 (2001). (Emphasis added.) The "reasonableness" requirement can be a severe limitation on finding an ambiguity.

●If a limitation on coverage is not expressed clearly enough to inform the insured of the extent of coverage

---

[2] An ambiguity in an insurance policy is broadly defined to include contract provisions capable of conflicting interpretations. *Auto Club Ins Ass'n v DeLaGarza,* 433 Mich 208, 214; 444 NW2d 803 (1989).

"If a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous and should be construed against its drafter and in favor of coverage." *Raska v Farm Bureau Mut Ins Co of Michigan,* 412 Mich 355, 362; 314 NW2d 440 (1982).

purchased, the provision is construed against the drafter, the insurance company.[3]

&bull;In interpreting a policy, exceptions to general liability are to be strictly construed against the insurer.[4]

&bull;The contract of insurance may include not only the written policy, but also the advertising and the application.[5]  The general rule of contract interpretation,

---

[3] When an insurer "has failed to clearly express a limitation on coverage so as to fairly apprise the insured of the extent of the coverage purchased, it is appropriate to construe the provision under consideration against its drafter."  *Auto Club Ins Ass'n v DeLaGarza,* 433 Mich 208, 214-215; 444 NW2d 803 (1989).

[4] Technical constructions of insurance policies are not favored and exceptions to the general liability provided for in an insurance policy are to be strictly construed against the insurer. *Francis v Scheper,* 326 Mich 441, 448; 40 NW2d 214 (1949). Exclusion clauses in insurance policies are construed strictly against the insurer.  *Century Indemnity Co v Schmick*, 351 Mich 622, 626-627; 88 NW2d 622 (1958).

[5] Where the advertising and the application stated that the policy would be in force as soon as the application and $1 for the first month's premium was received, but the policy was not issued until 18 days later, the Court held that the advertising and the application created an ambiguity about when the policy should go into effect.  The Court construed this ambiguity in favor of the insured, stating:

> If there is any doubt or ambiguity with reference to a contract of insurance which has been drafted by the insurer, it should be construed most favorably to the insured.  Under that rule the application and advertising in the case before us must be construed most favorably

(continued…)

4

in contrast, is that "[a]bsent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters, supra* at 496.

These specialized rules of interpretation protect the consumer buying insurance, especially no-fault insurance, which every automobile owner is required by law to purchase; they should not be so lightly swept aside with no discussion and without regard for five decades of precedent. For these reasons, I dissent and concur in the result of Justice Kelly's dissent.

Elizabeth A. Weaver

---

(…continued)
> to the insured. We construe this to mean the policy would be in effect without delay. [*Gorham v Peerless Life Ins Co,* 368 Mich 335, 343-344; 118 NW2d 306 (1962) (citation omitted).]

5